UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AVISHAI ABRAHAMI,

                      Plaintiff,

    - against -

MEISTER SEELIG & FEIN LLP and DANIEL J. DWYER,

                      Defendants.

**COMPLAINT**

Plaintiff Avishai Abrahami ("Abrahami")[1] by his attorneys Zeichner Ellman & Krause LLP, for his complaint against defendants Meister Seelig & Fein LLP (the "Firm") and Daniel J. Dwyer ("Dwyer", and together with the Firm, "Meister Seelig" or "Defendants"), alleges, upon information and belief, as follows:

## INTRODUCTION

1. This is a legal malpractice action by Abrahami, an Israeli citizen and resident, against Meister Seelig. Abrahami is the founder and Chief Executive Officer of the software company Wix.com. In August 2020 Abrahami was approached about a business opportunity in the United States involving HFZ Capital Group, a prominent New York real estate developer.

---

[1] As the context requires, references to Abrahami include his agents.

2. In broad terms, the transaction proposed was that Abrahami would lend $30 million to two companies within the HFZ Capital Group, with the loan secured by the borrowers' ownership interest in certain borrower-controlled subsidiaries that owned industrial real estate properties. If there was a default on his loan, Abrahami would take ownership of the entities which owned the properties, and thus own the properties (subject to any existing mortgage loans). It was critical to Abrahami that the loan be secured by the promised collateral, and that in the absence of the borrowers initiating legal action, he be able to secure ownership and control of the collateral without having to initiate court action of his own.

3. To ensure his interests were protected, Abrahami retained both U.S. legal counsel (Meister Seelig) and an Israeli lawyer. Abrahami tasked Israeli counsel with communicating with Meister Seelig, on his behalf, concerning the loan transaction.

4. The loan closed on September 8, 2020, with Abrahami lending to the borrowers $30 million.

5. As part of the transaction, the borrowers had the relevant subsidiaries assign to Abrahami their membership interests in the LLCs that own the underlying real estate. The assignments of the LLC interests were the (purported) collateral for the loan, and were to be held in escrow by Meister Seelig, as escrow agent. If there was a default, Meister Seelig would deliver the assignments to Abrahami. Notably,

however, there was no actual pledge of the LLC interests, which would have been required to create a security interest under the Uniform Commercial Code.

6. Despite the lack of a pledge, Meister Seelig assured Abrahami that the assignments in escrow would secure the loan and enable Abrahami to quickly obtain the assigned collateral in the event of a default. This was legal malpractice – one of several negligent acts by Meister Seelig. The assignments did not create a security interest in the LLC interests that were the purported collateral, much less a perfected one, which would have given Abrahami priority over other creditors and/or a bankruptcy debtor or trustee. As a result, Abrahami unknowingly made a $30 million unsecured loan.

7. Abrahami soon bore the consequences of Meister Seelig's malpractice. On November 25, 2020, an entity called Monroe Capital sent Meister Seelig a written notice claiming it held a senior lien on the borrower assets that had recently been assigned to Abrahami.

8. Monroe Capital's notice to Meister Seelig also asserted that: (i) its senior loans had been in default at the time Abrahami made his loan; (ii) its senior loans did not permit the borrowers to enter into the loan with Abrahami; (iii) its senior loans did not permit the borrowers to assign the LLC interests that were Abrahami's purported collateral; and (iv) a public UCC sale of certain assets of the borrowers (which Monroe Capital claimed included the assigned LLC interests) was scheduled for December 2, 2020.

9. Upon receiving the November 25 notice, Meister Seelig did not advise Abrahami of the notice, notify him about the Monroe Capital loans, or otherwise take any action to protect his rights and interests. Instead, Meister Seelig sat on the November 25 notice for nearly a month. It did not send it to Abrahami until December 18, 2020, two days after receiving a second notice stating Monroe Capital had been the winning bidder of the auctioned borrower assets at the December 2 sale. Meister Seelig's failure to notify Abrahami about the Monroe Capital notice or the UCC sale compounded its malpractice, as it prevented him from taking any action to protect his collateral prior to its purported sale, even though Meister Seelig, his attorneys, had been given notice on his behalf.

10. In fact, Abrahami was not aware of the Monroe Capital loans at the time he made his loan. Meister Seelig provided no information concerning Monroe Capital, even though a UCC search by Meister Seelig would have shown that Monroe Capital had filed a financing statement in October 2018 claiming a security interest in "all assets including proceeds and products" of the same borrowers.

11. Meister Seelig's failure to discover and inform Abrahami of the Monroe Capital senior loans is yet another aspect of its malpractice. Abrahami would not have made the loan if he had known about Monroe Capital's prior loans and its (publicly filed) claim to a prior perfected security interest in all of the borrowers' assets.

12. Meister Seelig's negligent actions have independently and cumulatively caused Abrahami actual and ascertainable damages. The borrowers have

defaulted on Abrahami's loan and have failed to pay back any of the money owed, despite demand, and Meister Seelig has refused to release the assignments from escrow. Abrahami now faces the prospect of lengthy and expensive litigation, on multiple fronts, to have any chance for recovery, however remote. This is precisely the circumstance Abrahami thought he had bargained to avoid when he made the loan.

13. If Meister Seelig had done its job, as a prudent attorney would have, Abrahami would have known the true risks and would not have made the loan. Instead, Meister Seelig committed multiple acts of malpractice and, as a result, Abrahami has lost $30 million.

## PARTIES

14. Abrahami is an individual residing in Tel Aviv, Israel.

15. Upon information and belief, the Firm is a New York limited liability partnership.

16. Upon information and belief, Dwyer is an individual residing in the State of New York and was, at all relevant times, a partner in the Firm.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of costs and interest.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## FACTUAL BASIS OF LEGAL MALPRACTICE CLAIM

A. **Abrahami's $30 Million Loan to Borrowers**

19. By a Loan Agreement dated September 8, 2020 (the "Loan Agreement"), Abrahami loaned HFZ Member RB Portfolio LLC (the "Portfolio Borrower") and HFZ Member RB Acquisitions LLC (the "Acquisitions Borrower" and, together with the Portfolio Borrower, the "Borrowers") the amount of $30,000,000 (the "Loan").

20. Abrahami retained Meister Seelig to represent him in connection with the Loan. Meister Seelig began to provide legal services and advice to Abrahami, and the retention was memorialized by an engagement letter dated August 31, 2020.

21. To facilitate communication with Meister Seelig regarding the Loan transaction, Abrahami also engaged an Israeli lawyer, Shachar Shimony ("Shimony"). Shimony is not licensed to practice in any jurisdiction in the United States. Shimony served as Abrahami's principal contact with Meister Seelig concerning the Loan.

22. In connection with the Loan Agreement, Borrowers caused to be executed and delivered an Assignment and Assumption of Membership Interest by HFZ

Member 1100 LLC (a subsidiary of the Portfolio Borrower), as assignor, in favor of Abrahami, as assignee, entered into as of September 8, 2020, with respect to 100% of its interests in 1100 Milwaukee Ave, LLC (the "1100 Milwaukee Assignment"). The 1100 Milwaukee Assignment related to real property located at 1100 Milwaukee Avenue, South Milwaukee, Wisconsin 53172 (the "1100 Milwaukee Property").

23. In connection with the Loan Agreement, Borrowers also caused to be executed and delivered an Assignment and Assumption of Membership Interest by HFZ Reich Properties LLC (a subsidiary of the Acquisitions Borrower), as assignor, in favor of Abrahami, as assignee, entered into as of September 8, 2020, with respect to 100% of its interests in Buffalo Bailey LLC (the "Buffalo Bailey Assignment"). The Buffalo Bailey Assignment related to real property located at 500 Bailey Avenue, Buffalo, New York 14210 (the "500 Bailey Property").

24. In connection with the Loan Agreement, Borrowers also caused to be executed and delivered an Assignment and Assumption of Membership Interest by HFZ Reich Properties LLC, as assignor, in favor of Abrahami, as assignee, entered into as of September 8, 2020, with respect to 100% of its interests in 707 Spence Lane LLC (the "707 Spence Lane Assignment," and together with the 1100 Milwaukee Assignment and the Buffalo Bailey Assignment, the "Assignments"). The 707 Spence Lane Assignment related to real property located at 707 Spence Lane, Nashville, Tennessee 37217 (the "707 Spence Lane Property," and, together with the 1100 Milwaukee Property and 500 Bailey Property, the "Properties"). (The LLC membership interests that were assigned through

the Assignments are collectively referred to as the "LLC Interests.") As the Assignments were made by subsidiaries of the Borrowers, they were "upstream assignments" and thus vulnerable to fraudulent conveyance claims if the putative assignors were insolvent.

25. Pursuant to an Escrow Agreement, dated as of September 8, 2020, between the Borrowers and Abrahami (the "Escrow Agreement"), the Assignments were placed in escrow with Meister Seelig, as Escrow Agent, to be released to Abrahami in the event of a default by the Borrowers.

26. It was critical to Abrahami that he obtain a security interest in the LLC Interests. The LLC Interests were, as Abrahami understood it, the collateral for the Loan.

27. It was also critical to Abrahami that, if the Borrowers defaulted on the Loan, he be able to secure his collateral (the LLC Interests) as quickly and easily as possible, without having to initiate legal proceedings. And Shimony, on behalf of Abrahami, made this clear in his communications with Meister Seelig. Shimony made it equally clear that Abrahami was relying on Meister Seelig, as U.S. legal counsel, to ensure this objective was achieved.

28. On August 27, 2020, Shimony wrote to Meister Seelig regarding the proposed structure of the deal: "I don't understand what does it mean, how can it work by means of corporate actions and how can we ensure that indeed it's done without the necessity to go to court and to ensure that they can't stop the exercise process."

29. Shimony requested that Meister Seelig "talk to [one of the principals of the Borrowers] and understand the procedure of getting control over the assets in a way which will enable [Abrahami] to sell them, repay the first mortgage to the bank and get the loan from the balance – al[l] the automatic way without the need to go to court and without HFZ's possibility to stop it." (The reference to the "first mortgage" is the mortgage loans on each of the Properties, which Abrahami was aware of.)

30. Furthermore, Shimony wrote to Meister Seelig that "I would also wish to have your opinion whether do you think this is customary security (in Israel it's [sic] won't work)."

31. In response, Meister Seelig advised that the Assignments and Escrow Agreement "will act as security for the loan and will act as alternative to court action. This structure will not require lender to resort to court to effect the transfer and will not require further action from borrower to be effective in the event of a default."

32. And when Shimony again asked Meister Seelig whether the deal structure provided adequate security for the Loan, Meister Seelig replied:

> Yes- the proposal is workable.
>
> Other than from court they could not stop the sale of the assets.
>
> The biggest risk is the Senior Lender. A mortgage foreclosure would prevent any ability of our Lender to take control of the assets.

9

> Our Lender's protection will be to pay off the Senior Loan if necessary, to gain control of the assets. So long as Lender is prepared to pay off the senior loan in full (including any interest, penalties and fees required by the senior loan documents) Our lender can protect its collateral.[2]

33. Shimony communicated Meister Seelig's legal analysis and advice to Abrahami, which Abrahami relied on in making the Loan.

34. At the time he made the Loan, it was Abrahami's understanding, based on Meister Seelig's legal advice, that he had a security interest in the LLC Interests (that is, he was making a secured loan).

35. It was also Abrahami's understanding, based on Meister Seelig's legal advice, that the deal structure provided him with a straightforward and low risk means of securing legal possession of the LLC Interests (the collateral for the Loan), in the event the Borrowers defaulted.

36. In actuality, the Assignments did not give Abrahami a security interest in the LLC Interests, because there was no pledge of the LLC Interests pursuant to Article 9 of the Uniform Commercial Code. There is no pledge agreement, or security agreement, concerning the LLC interests. As such, Abrahami does not, contrary to what he believed when he made the Loan, have a security interest in the collateral, much less a perfected one.

---

[2] Again, the "Senior Loan" refers to the existing mortgage loans on the Properties, which were identified in the Loan Agreement.

37. Abrahami would not have made the Loan if he knew it was an unsecured loan.

**B.** **The Monroe Capital Loans**

38. On November 25, 2020, Monroe Capital sent Meister Seelig a notice concerning the Loan (the "November 25 Notice").[3] This notice included reference to (i) a loan by Monroe Capital to the Borrowers dated October 30, 2018, in the amount of $43,466,019.00, and (ii) a loan by Monroe Capital to HFZ Capital Group LLC (the Borrowers' ultimate parent company) dated October 20, 2017, in the amount of $113,500,000.00 (together, the "Monroe Capital Loans").

39. The November 25 Notice to Meister Seelig also asserted, among other things, that: (i) the Monroe Capital Loans were in default at the time Abrahami made the Loan; (ii) the Loan was not permitted by the Monroe Capital Loans; (iii) the Assignments were not permitted by the Monroe Capital Loans; and (iv) a public UCC sale of certain assets of the Borrowers, including, according to Monroe Capital, the LLC Interests that were Abrahami's purported collateral for the Loan, was scheduled for December 2, 2020 (the "December 2 UCC Sale").

40. Monroe Capital also advised Meister Seelig, in the November 25 Notice, that it was "deeply concerned that the Borrower and its subsidiaries appear to

---

[3] "Monroe Capital" refers, individually and collectively, to MC Asset Management (Corporate), LLC and MC Asset Management (Industrial), LLC, in their respective capacities as administrative agent (as successor-in-interest to Monroe Capital Advisors, LLC).

11

have engaged in conduct aimed at fraudulently transferring certain valuable assets after an acceleration of the [Monroe Capital Loans]."

41. Meister Seelig did not forward the November 25 Notice to Abrahami, or otherwise inform him about it.

42. Meister Seelig took no actions whatsoever to protect Abrahami's rights and interests upon receiving the November 25 Notice.

43. On December 16, Monroe Capital sent a second notice to Meister Seelig (the "December 16 Notice"), claiming that Monroe Capital was the winning bidder at the December 2 UCC Sale, and that such sale included certain assets of the Borrowers, including the LLC Interests that were the subject of the Assignments and Abrahami's purported collateral for the Loan. The December 16 Notice included, among other documents, the November 25 Notice that Meister Seelig had failed to send to Abrahami.

44. On December 18, 2020, two days after receiving the December 16 Notice and sixteen days after the December 2 UCC Sale (which sale Meister Seelig had received notice of on November 25), Meister Seelig forwarded the notice to Shimony, Abrahami's Israeli counsel.

45. Meister Seelig's failure to send Abrahami the November 25 Notice, or to otherwise inform him of it, deprived Abrahami of any opportunity to protect the Loan "collateral" or his legal position prior to – or at – the December 2 UCC Sale (of which he was unaware).

46. In addition, Meister Seelig should have, prior to the Loan closing, run a UCC search of the Borrowers, to identify any prior perfected security interests, and notified Abrahami of the UCC-1 financing statements, filed by Monroe Capital in 2018, asserting a security interest in "all assets including proceeds and products" of the Borrowers (together, the "Monroe Capital UCC-1")

47. Meister Seelig did not provide Abrahami with any information concerning the Monroe Capital UCC-1 prior to closing of the Loan.

48. Meister Seelig did not provide Abrahami with any information concerning the Monroe Capital Loans prior to December 18, 2020, when Meister Seelig forwarded to Shimony the December 16 Notice.

49. Abrahami was not aware of the Monroe Capital UCC-1 at the time he made the Loan.

50. Abrahami was not aware of the Monroe Capital Loans at the time he made the Loan.

51. Abrahami would not have made the Loan if he had known about the Monroe Capital UCC-1.

52. Abrahami would not have made the Loan if he had known about the Monroe Capital Loans.

## C.     Borrower Defaults but Meister Seelig Refuses to Release the Assignments

53. By notice dated March 4, 2021 (the "Default Notice"), Abrahami notified the Borrowers that they were in default under the Loan Agreement, by reason of (i) Borrower's failure to make required payments under the Loan Agreement and (ii) the transfer, or purported transfer, of certain assets of the Borrowers.

54. By the Default Notice, Abrahami accelerated the Loan and demanded payment of all amounts due thereunder by March 9, 2021.

55. The Borrowers did not respond to the Default Notice and have not paid any amounts due under the Loan Agreement.

56. Abrahami has demanded, based on the Borrowers' default under the Loan Agreement, that Meister Seelig, as Escrow Agent under the Escrow Agreement, release the Assignments to Abrahami.

57. Monroe Capital has demanded that Meister Seelig not release the Assignments to Abrahami, despite the Borrowers' default, claiming that the Assignments constituted the fraudulent conveyance of collateral the Borrowers had previously pledged to Monroe Capital and that the Assignments were made in violation of the Monroe Capital Loans.

58. Meister Seelig has not released the Assignments from escrow, notwithstanding that Meister Seelig had assured Abrahami that nothing but court action by the Borrowers would interfere with delivery of the Assignments by the escrow agent.

## **FIRST CAUSE OF ACTION (LEGAL MALPRACTICE)**

59. Abrahami repeats and realleges the allegations contained in paragraphs 1 through 58.

60. Abrahami retained Meister Seelig to represent him in connection with the Loan.

61. Meister Seelig breached their professional duties to Abrahami by: (i) failing to provide him with proper legal advice in connection with the Loan, including advising that the Assignments provided him with a security interest in the LLC Interests, and not advising that the Assignments were susceptible to fraudulent conveyance claims; (ii) assuring Abrahami the escrow agreement structure would protect him in the event of a default; (iii) failing to discover and inform Abrahami of the Monroe Capital UCC-1 or the Monroe Capital Loans; and (iv) failing to notify Abrahami about, or take any action regarding, the November 25 Notice or the December 2 UCC Sale. By these acts and omissions, Meister Seelig failed to exercise the reasonable skill and knowledge commonly possessed by members of the legal profession.

62. But for Meister Seelig's negligence, Abrahami would not have made the Loan.

63. As a result of Meister Seelig's negligence, Abrahami has suffered actual and ascertainable damages, in an amount to be proven at trial but not less than $30 million, which damages include all costs and expenses incurred by Abrahami related to efforts to mitigate the harm caused by Meister Seelig.

WHEREFORE, Abrahami demands judgment against Defendants as follows:

    (a) on the first cause of action, damages in an amount to be proven at trial, but not less than $30,000,000, including expenses and damages related to mitigation; and

    (b) together with the costs and disbursements of this action, and such other and further relief as the Court deems just and proper.

Dated: New York, New York
December 1, 2021

ZEICHNER ELLMAN & KRAUSE LLP

By: /s/ Stuart A. Krause
Stuart A. Krause, Esq.
Michael E. Sims, Esq.
Attorneys for Plaintiff
1211 Avenue of the Americas
New York, New York 10036
(212) 223-0400