USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/22/2023

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
AVISHAI ABRAHAMI,

                            Plaintiff,

            -against-

MEISTER SEELIG & FEIN LLP and DANIEL J. DWYER,

                            Defendants.
------------------------------------------------------------------X

**OPINION AND ORDER ON
MOTION TO COMPEL
PRODUCTION OF DOCUMENTS
WITHELD AS PRIVILEGED**

**21-CV-10203 (JFK) (KHP)**

KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE

      Defendants Meister Seelig & Fein LLP ("MSF") and Daniel J. Dwyer have moved to compel production of approximately 45 documents withheld by Plaintiff's counsel, Seyfarth Shaw LLP ("Seyfarth"), and listed on a privilege log. The grounds for withholding are that the documents are protected by the attorney-client privilege and/or work product doctrine and are otherwise irrelevant to the issues in the case.

**BACKGROUND**

      Plaintiff Avishai Abrahami, founder and Chief Executive Officer of the software company Wix.com, brings this malpractice action against MSF and Dwyer in connection with their representation of him in connection with a $30 million loan he made to two companies within the HFZ Capital Group ("HFZ Borrowers"). (Compl. ¶ 1, ECF No. 1.) Abrahami is Israeli and a resident of Israel. His Israeli lawyer, Shachar Shimony, assisted in retaining U.S. counsel and ultimately retained Defendants to assist with the loan transaction. (*Id.* at ¶ 21.) Abrahami also engaged Ohad Avital to negotiate the transaction and interact with his lawyers and for which Avital received a commission. (Def. Br. 1-2.) The written retainer with Defendants charged

1

Defendants with "negotiating the documentation relating to" to the loan. Defendants worked with Avital and Shimony to prepare the documentation and close the deal. (Shimony Dep. 158:10, ECF No. 75-13.)

According to Plaintiff, a material condition of the transaction was that certain subsidiaries of the HFZ Borrowers were supposed to have assigned their membership interests in LLCs that owned real estate to Abrahami as collateral for the loan. (Def.'s Am. Answer & Countercl. 12-13.) Those assignments were then to be held in escrow by MSF and upon a default, MSF would deliver the assignments to Abrahami. (*Id.* at 13.) However, the HFZ Borrowers did not actually pledge the LLC interests to Abrahami and the LLC's co-members did not consent to the assignment, both of which were required to create a valid and enforceable security interest. (Pl.'s Resp. 6.) Additionally, Defendants failed to conduct a proper UCC-1 search before closing, which would have revealed that another company, Monroe Capital, had issued a loan secured by the same collateral, and that the borrowers had already defaulted on the loan payments.[1] (*Id.* at 4.) In other words, Monroe Capital had a superior interest in the collateral. In November 2020, Monroe Capital notified MSF that it had a senior interest in the collateral and was scheduling a UCC sale of assets in December. (*Id.* at 7.) MSF failed to notify Abrahami about this development. On December 2, 2020, Monroe Capital purchased certain foreclosed assets, including the collateral for Abrahami's loan. On December 16, 2020, Monroe Capital sent another notice to MSF stating that it was the winning bidder at the December 2, 2020 UCC sale. (*Id.*) MSF sent that notice to Abrahami, but the sale had already occurred and

---

[1] Although the HFZ Borrowers had represented in the loan documentation with Abrahami that no other loans existed that impacted Abrahami's interest in the collateral, it appears that the representation was false.

Abrahami was left with an unenforceable assignment. In January 2021, the HFZ Borrowers defaulted on their loan payments to Abrahami. (*Id.* at 8.) Abrahami terminated Defendants in late January 2021.

Abrahami asked the Chief Legal Officer, Eitan Israeli, of his company to assist in locating counsel to assist with the problem of the defaulting Borrowers and the purchase of the collateral by Monroe Capital. Israeli reached out to Seyfarth. Abrahami formally engaged Seyfarth on February 25, 2021 to enforce his rights under the defaulted loan. (*Id.*) Shimony, Abrahami's Israeli attorney, and Avital, who negotiated the loan transaction for Abrahami, were included in certain communications with Seyfarth. (*Id.* at 8-9.)

On March 4, 2021, Abrahami sent the HFZ Borrowers a default notice, prepared by Seyfarth, and copied Monroe Capital on the notice. (*Id.* at 8.) The notice demanded payment and indicated that Abrahami would direct MSF to release the assignments to him. Monroe Capital demanded that MSF not release the assignments on the grounds that the assignments were a fraudulent conveyance of collateral that the HFZ Borrowers had previously pledged to Monroe Capital, threatening legal action if MSF released the assignments. (Carley Decl. Exh. O, ECF No. 75-15.) MSF did not release the assignments from escrow, notwithstanding its alleged assurance that nothing but a court action by the HFZ Borrowers would interfere with delivery of the assignments.

MSF contends that it was prevented from releasing the escrowed assignments because Monroe Capital threatened to sue and that but for copying Monroe Capital on the default notice, Monroe Capital would not have known that Abrahami was requesting release of the assignments to him. (Def. Br. 18.) Thus, Defendants posit that but for the "tip-off" MSF would

3

and could have released the assignments to Abrahami.  Defendants charge Plaintiff with manufacturing an escrow dispute and harming his own claim to the collateral.  (*Id.*)  They also contend that to the extent Plaintiff is alleging that MSF committed malpractice by failing to release the assignments from escrow notwithstanding the dispute between Plaintiff and Monroe Capital as to their release, advice by Seyfarth concerning the assignments is relevant to the claims and counterclaims and at issue.  (*Id.* at 18-19.)

The escrow agreement provides that MSF may continue to hold the assignments in escrow until a final order or judgment is entered with respect to the delivery of the assignments.  (Def.'s Am. Answer & Countercl. 11.)  According to Defendants, Abrahami has not made any effort to resolve the dispute with Monroe Capital.  The escrow agreement also states that MSF shall not be liable for a refusal to comply with a demand to release the assignments and that Abrahami will indemnify MSF for damages, costs and expenses incurred in the defense of claims concerning its role as escrow agent and reimburse MSF for reasonable costs and expenses incurred in performing its duty as escrow agent.  (*Id.* at 14.)  For this reason, Defendants assert counterclaims against Plaintiff for indemnification, fees and costs relating to this litigation to the extent they arise out of Defendants' role as escrow agent.  (*Id.* at 15.)

**THE DOCUMENTS AT ISSUE**

Defendants sought discovery on why Abrahami copied Monroe Capital on the default notice to the HFZ Borrowers and alerted it to his intent to seek release of the assignments from MSF as escrow agent.  (Def. Br. 17-18.)  Plaintiff testified at his deposition that he did not know why Monroe Capital was copied.  (Abrahami Dep. 332:25-334:25, ECF No. 75-12.)  He declined

4

to answer questions about his communications with Seyfarth, which had prepared the notice, on the ground of privilege.

Plaintiff did not include in his production any communications with Seyfarth, so Defendants subpoenaed Seyfarth seeking communications concerning the decision to copy Monroe Capital on the default notice as well as communications it had with Avital and Shimony. (Def. Br. 7-8.)  Seyfarth responded to the subpoena but withheld the documents at issue (all email communications) on the grounds that they are protected by attorney-client privilege and/or the work product doctrine. (*Id.* at 8.)  Plaintiff did not update his privilege log to include the documents on the Seyfarth-produced privilege log. (*Id.*)

Defendants contend that Abrahami waived privilege by including Avital in 23 communications and by including Shimony on 14 communications with Seyfarth. (*Id.* at 12.) They also fault Abrahami for not logging the communications on his privilege log and instead only including them on the log produced by Seyfarth. (*Id.*)  Defendants also contend that Plaintiff has put Seyfarth's advice at issue in this litigation and thereby waived privilege. (*Id.* at 17.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 26(b)(1) permits discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case" considering certain listed factors.  "Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).

In diversity cases such as this, where state law governs the claims, state law defines the scope of the attorney-client privilege. *Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*,

5

210 F.R.D. 506, 508 (S.D.N.Y. 2002); *Kleeberg v. Eber*, 2019 WL 2085412, at *6 (S.D.N.Y. May 13, 2019); *see also* Fed. R. Evid. 501.

"Unlike the attorney-client privilege, the work product protection in diversity cases is governed by federal law." *Bowne of New York City, Inc.*, 161 F.R.D. 258, 264 (S.D.N.Y. 1995) (citing *Fine v. Facet Aerospace Prods. Co.*, 133 F.R.D. 439, 444–45 (S.D.N.Y. 1990)); *see also* Fed. R. Civ. P. 26(b)(3-4) (defining trial preparation materials and communications subject to protection).

The party asserting privilege or work product protection bears the burden of showing they apply and have not been waived. *See, e.g.*, *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011); *Priest v. Hennessy*, 51 N.Y.2d 62, 69 (1980); *New York Times Newspaper Div. of New York Times Co. v. Lehrer McGovern Bovis, Inc.*, 300 A.D.2d 169, 172 (App. Div. 2002).

Under New York law, the state law applicable here, a communication is protected by the attorney-client privilege if it was made within the context of an attorney-client relationship for the purpose of obtaining or conveying legal advice and was intended to be and actually confidential. *Bowne of New York City, Inc. v. AmBase Corp.*, 161 F.R.D. 258, 264 (S.D.N.Y. 1995) (citing *People v. Osorio,* 75 N.Y.2d 80, 82–84, 549 N.E.2d 1183, 1185 (1989)). The privilege is narrowly construed because it hinders the truth-finding process by rendering certain relevant information undiscoverable. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *see also Hoopes v. Carota*, 142 A.D.2d 906, 908, 531 N.Y.S.2d 407, 409 (App. Div. 1988) *aff'd,* 74 N.Y.2d 716, 543 N.E.2d 73 (1989) (explaining that the attorney-client privilege "constitutes an obstacle to the truth-finding process" and, thus, its "invocation should be cautiously observed to ensure

6

that its application is consistent with its purpose") (internal quotation marks, alterations, and citations omitted).

## ANALYSIS

Plaintiffs first argue that the communications at issue are not relevant and thus not discoverable. They base this argument on the fact that Seyfarth was hired after Defendants were fired and thus their advice is not relevant to their malpractice claim which focuses on Defendants' conduct in the transaction. This argument is not persuasive. The scope of relevance under Rule 26(b)(1) is broad. The complaint in this action criticizes Defendants for, among other things, advice regarding the assignments held in escrow and conditions on their release. The counterclaims concern the terms of the escrow agreement. Additionally, Seyfarth advised on Abrahami's ability to request the assignments' release from escrow and MSF's ability to release the assignments from escrow. Thus, to the extent the communications at issue touch on the escrow agreement's terms and their meaning in the context of advising Abrahami whether to notify Monroe Capital of the assignments held in escrow and Abrahami's intent to demand their release to him, possible impediments to MSF's release of the assignments from escrow, or Abrahami's obligations under the escrow agreement, the communications fall within the broad scope of relevance.

Defendants argue that privilege and/or work product protection has been waived for three reasons: (1) Abrahami failed to update his privilege log to include the communications listed on Seyfarth's log on his log; (2) the communications were not confidential insofar as he disclosed them to his Israeli attorney, Shimony, and/or to his business agent for the deal, Avital;

and (3) Abrahami put the communications at issue by claiming that Defendants violated their obligation as escrow agent. I address each in turn.

1. *Waiver for Failure to Include on Privilege Log*

Federal Rule 26(b)(5)(A) and Local Civil Rule 26.2 both provide that a party who withholds a document on the grounds of privilege or work product must "expressly make the claim" and identify the applicable privilege and provide sufficient information to enable the other party to assess the claim. This is done on a privilege log. A failure to provide a privilege log can result in a waiver of both attorney-client privilege and work product protection. Fed. R. Civ. P. 26(b)(5), advisory committee's note to 1993 amendment ("To withhold materials without such notice is contrary to the rule, subjects the party to sanctions under Rule 37(b)(2), and may be viewed as a waiver of the privilege or protection."); *see also United States v. Construction Prods. Research, Inc.*, 73 F.3d 464, 473-74 (2d Cir. 1996).

At the same time, courts have endorsed a flexible approach in assessing waiver in this context and will evaluate the circumstances of the privilege claim and the specifics of the log, among other factors. *Robinson v. De Niro*, 2022 WL 704922, at *3-4 (S.D.N.Y. Mar. 9, 2022); *Pem-America, Inc. v. Sunham Home Fashions, LLC*, 2007 WL 3226156, at *2 (S.D.N.Y. Oct. 31, 2007) ("Only flagrant violations of these rules should result in a waiver of privilege.") (internal quotation marks omitted); *In re Honeywell Int'l, Inc. Sec. Litig.*, 230 F.R.D. 293, 299 (S.D.N.Y. 2003) (noting that some courts employ a flexible approach in assessing a waiver argument, examining "the nature of the violation, its willfulness or cavalier disregard for the rule's requirements, and the harm which results to other parties") (internal quotation marks omitted).

Here, Seyfarth, as Abrahami's counsel, provided a privilege log. They necessarily did so at Abrahami's direction because the client is the holder of the attorney-client privilege. *In re China Med. Techs., Inc.*, 539 B.R. 643, 658 (S.D.N.Y. 2015); *Osorio*, 75 N.Y.2d at 84, 549 N.E.2d at 1185. While both the attorney and the client hold the work product privilege, the distinction exists for the purpose of requiring that both the attorney and client waive privilege and not that both must assert the privilege. *In re China Med. Techs., Inc.*, 539 B.R. at 658. Abrahami could have updated his privilege log by repeating the same entries on Seyfarth's log, but that exercise was unnecessary. Defendants were apprised of the privilege objections and one log is sufficient. Accordingly, Defendants' argument that there has been a waiver for failure to update Abrahami's separate privilege log is unpersuasive.

**2.  *Waiver by Disclosure to Third-Party***

Attorney-client privilege generally is waived if the holder of the privilege discloses or consents to disclosure of privileged communications to a third party. *Osorio*, 75 N.Y.2d at 84, 549 N.E.2d at 1185; *New York Times Newspaper Div. of N.Y. Times Co. v. Lehrer McGovern Bovis, Inc.*, 300 A.D.2d 169, 172, 752 N.Y.S.2d 642, 645–46 (App. Div. 2002) ("Disclosure of a privileged document generally operates as a waiver of the privilege unless it is shown that the client intended to maintain the confidentiality of the document, [and] that reasonable steps were taken to prevent disclosure...." (citations omitted)). However, if the third party is an agent of the attorney or client, then the disclosure may not result in a waiver. *Netherby Ltd. v. G.V. Trademark Investments, Ltd.*, 261 A.D.2d 161, 161, 689 N.Y.S.2d 488, 489 (App. Div. 1999) (citing *Le Long v. Siebrecht*, 196 A.D. 74, 76, 187 N.Y.S. 150, 151 (App. Div. 1921)).

New York courts have developed a two-prong test to determine whether disclosure by a party to a purported agent of the party results in waiver of the attorney-client privilege. Although no formal agency agreement is required, the party asserting privilege must demonstrate that when it disclosed the privileged communication to the purported agent: (1) it had a "reasonable expectation of confidentiality under the circumstances," and (2) the disclosure "was necessary for the client to obtain informed legal advice." *Ross v. UKI Ltd.*, 2004 WL 67221, at *3 (S.D.N.Y. Jan. 15, 2004) (internal quotation marks and citations omitted). To meet the second prong of the test, the party asserting privilege must demonstrate "that the involvement of the third party [was] nearly indispensable or serve[d] some specialized purpose in facilitating the attorney-client communications." *Id.* (internal quotation marks and citation omitted).

A. **Disclosure to Israeli Attorney**

Shimony was Abrahami's Israeli counsel on the underlying loan transaction. It is not unreasonable for Abrahami to include Shimony on conversations with his U.S. counsel, Seyfarth, when discussing how to respond to the default on the loan and a request for release of the assignments. Although he was not licensed to practice in New York, he was no doubt acting at Abrahami's direction as an agent whose presence in privileged communications would not result in a waiver of privilege.

Defendants argue that Shimony was not representing Plaintiff on the default-related issues and that this should somehow impact the analysis of waiver. The Court disagrees. That Shimony's representation of Abrahami on the underlying loan transaction had concluded does not mean he was not Abrahami's attorney or agent or that his obligations to his client ended.

10

That Abrahami wanted Shimony involved demonstrates Shimony was still providing assistance to Abrahami on the ongoing issues with the loan transaction, at least insofar as he was providing Seyfarth with necessary information so Seyfarth could advise on enforcement options. It is both reasonable and expected that the attorney who was involved in negotiating the loan transaction would communicate with counsel hired to enforce rights after a default on the loan. Indeed, Shimony's communications with Seyfarth were necessary to ensuring Seyfarth was fully informed to be able to render appropriate legal advice and no doubt also necessary to interact with Plaintiff (who is Israeli) and interpret to the extent needed any legal advice being given by Seyfarth in light of previous legal advice given by Defendants.

Defendants cite no case law for the proposition that including Shimony in the communications with Abrahmi's New York lawyers would result in a waiver, and the Court is unaware of cases so holding. At least one court in this District has noted that Israel recognizes a form of attorney client privilege. *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 524 (S.D.N.Y. 1992). In light of this, and given the nature of the lawyer client relationship, it is also reasonable to conclude that Plaintiff had every expectation that Shimony would maintain confidences. Also, at least one court in this District has held that disclosure of privileged communications to a second attorney in communications that were themselves privileged does not result in waiver. *Solomon v. Scientific American, Inc.*, 125 F.R.D. 34 (S.D.N.Y. 1988). The above cases support the conclusion that including Shimony in communications with Seyfarth does not result in a waiver.

B. <u>**Disclosure to Business Agent**</u>

Whether disclosure to Avital results in a waiver is a closer question. Avital was Abrahami's business agent and communicated with the HFZ Borrowers and Shimony about the loan terms. He also interacted with Defendants—Plaintiff's prior New York attorneys—who were charged with preparing the paperwork for the loan transaction, among other things. As Plaintiff's agent, Plaintiff had a reasonable expectation that Avital would keep confidential any communications with his New York attorneys, unless directed otherwise. This satisfies the first prong of the two-part test discussed above. It is also reasonable for Seyfarth to have gathered information from Avital about the loan transaction to enable it to render informed legal advices.

Plaintiff argues that Avital's communications with Seyfarth were required to "improve the comprehension of the communications between attorney and client." (Def. Br. 13.) However, it is not clear to this Court how Avital's participation was necessary to do this. Unlike Shimony, who was an attorney and received and no doubt interpreted the U.S. lawyers' advice for their mutual Israeli client, Avital is not a lawyer. No doubt he had facts about the transaction that were critical for Seyfarth to collect and learn, but he was not needed to improve the comprehension of communications between attorney and client. *See Walsh v. CSG Partners, LLC*, 544 F. Supp. 3d 389, 392 (S.D.N.Y. 2021) (finding a third party whose only role was to provide information and advice the client did not have was insufficient to find that the third party was necessary to "improve comprehension"); *see also Delta Fin. Corp. v. Morrison,* 13 Misc.3d 441, 445–50, 820 N.Y.S.2d 745 (Sup. Ct. 2006) (finding necessary communications that improve the comprehension of attorney and client communications goes beyond providing

12

useful information because "the privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to the client") (quoting *United States v. Ackert*, 169 F.3d 136 (2d Cir. 1999)). Avital was not fulfilling a specialized purpose in facilitating the attorney-client communications. *Ross*, 2004 WL 67221, at *3. Also, Avital was not hired by Seyfarth to assist it in providing legal advice or in preparation for anticipated litigation. *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 93 A.D.3d 574, 574, 941 N.Y.S.2d 56, 58 (App. Div. 2012) (communications prepared by consultants hired by plaintiff's counsel were protected by attorney-client and work product privilege because the communications were prepared in anticipation of litigation and advised plaintiff of the potential claims it could raise against defendant).

At the same time, courts recognize that attorney investigations of facts can be privileged if necessary to render legal advice. *See Cicel (Beijing) Science & Technology Co., Ltd. v. Misonix, Inc.*, 331 F.R.D. 218, 230 (S.D.N.Y. 2019). They also recognize that communications with former employees and non-employee agents in connection with such investigations do not waive privilege. See *Carte Blanch (Singapore) PTE., Ltd. v. Diners Club Intern., Inc.*, 130 F.R.D. 28, 33 (S.D.N.Y. 1990). And, although Avital had completed work on the underlying loan transaction, it is clear from the documents this Court reviewed that Avital was directed by Abrahami to provide information to Seyfarth for purposes of Seyfarth rendering legal advice as to what to do about the defaulting Borrowers. Thus, Avital was acting as an agent when providing information about the loan transaction to Seyfarth as part of Seyfarth's initial investigation. His role as agent ended, however, once Seyfarth gathered the information it needed to provide legal advice.

13

Having reviewed the communications *in camera*, it is clear that Avital's initial communications with Seyfarth were in the role of agent to Abrahami to provide information necessary to rendering legal advice. Thus, his inclusion in the communications at this stage does not result in a waiver. *See Benedict v. Amaducci*, 1995 WL 23555, at *2 (S.D.N.Y. Jan. 20, 1995). However, one document reflects communications that occurred after Seyfarth had completed its initial fact investigation. This document, No. 64 from May 3, 2021 (3.33), is not privileged and must be produced.

Finally, there are a number of email communications on the log where a portion of the email chain is privileged but the remainder of the email chain simply discusses logistics of setting of a meeting or call. Those portions of the email chains are not privileged and also must be produced with the remaining portion of the emails redacted.

### 3. *At-Issue Waiver*

Attorney-client privilege also can be waived if the privileged communications are placed "at-issue" in the litigation and a party asserts reliance on counsel's advice as a defense to justify its actions. *Windsor Sec., LLC v. Arent Fox LLP*, 273 F. Supp. 3d 512, 520 (S.D.N.Y. 2017) (denying request for disclosure of communications protected by attorney-client privilege where those communications would not be used as evidence). Courts will find that privileged communications were put at issue where "[i]t would be unfair for a party who has asserted facts that place privileged communications at issue to deprive the opposing party of the means to test those factual assertions through discovery of those communications." *Id.* at 518; *see also In re County of Erie*, 546 F.3d 222, 229 (2d Cir. 2008) ("[A] party must *rely* on privileged advice from his counsel to make his claim or defense.") (emphasis in original); *Pearlstein v. BlackBerry*

14

*Ltd.*, 2019 WL 1259382, at *7 (S.D.N.Y. Mar. 19, 2019) (collecting cases); *Deutsche Bank Tr. Co. of Americas v. Tri-Links Inv. Tr.*, 43 A.D.3d 56, 64, 837 N.Y.S.2d 15, 23 (App. Div. 2007) (finding that if the mere relevance of privileged communications to the parties' dispute could trigger at-issue waiver, the "[attorney-client] privilege would have little effect") (citing *Long Is. Lighting Co. v. Allianz Underwriters Ins. Co.*, 301 A.D.2d 23, 33, 749 N.Y.S.2d 488 (App. Div. 2002)).

Plaintiff has not placed Seyfarth's advice at issue. Seyfarth advised Plaintiff on how to enforce the terms of the loan agreement against the HFZ Borrowers. While Seyfarth may have opined on whether Defendants committed malpractice and the terms of the escrow agreement, there is no malpractice claim asserted as to Defendants' failure to release the assignments from escrow. And while Defendants argue that the notice to Monroe Capital is relevant to damages, this argument does not operate to put the Seyfarth communications "at issue." Defendants' suggestion that they might have released the assignments if Monroe Capital had not asserted an interest goes to conduct that is not the subject of the malpractice claim and does not bear on damages from Defendants' failure to conduct a UCC-1 search or failure to obtain necessary pledges and signatures to create a valid assignment of the collateral—the conduct that is the subject of the malpractice claims. No cause of action against Defendants are based on the failure to release the assignments.

The counterclaims for indemnification, fees and costs arguably render the communications at issue relevant, but they do not trigger an "at issue" waiver. Only the holder of the privilege can waive it. Defendants cannot trigger a waiver of Plaintiff's privilege by asserting a counterclaim.

The law is well established that defendants in a legal malpractice case are "not entitled to invade the attorney-client privilege for successor counsel." *Windsor Sec., LLC v. Arent Fox LLP*, 273 F. Supp. 3d 512, 522 (S.D.N.Y. 2017). "Simply because [communications with successor counsel] might be useful in undermining [plaintiff's] explanation [for its subsequent litigation decisions] does not mean that the attorney-client privilege has been impliedly waived." *Leviton Mfg. Co. v. Greenberg Traurig LLP*, 2010 WL 4983183, at *6 (S.D.N.Y. Dec. 6, 2010). If successor counsel acted unreasonably in protecting the Plaintiff's interests, "defendants may demonstrate that failing based on the facts and circumstances of the [subsequent case filed] and the law applicable to the limitations defense there." *TIG Ins. Co. v. Yules & Yules*, 1999 WL 1029712, at *2 (S.D.N.Y. Nov. 12, 1999). Demonstrating this does not require access to Plaintiff's attorney-client communications. *Id.* Here, Seyfarth, as successor counsel, provided subsequent advice on Plaintiff's notice and demand after the actions taken that form the basis for the malpractice claims. Defendants seek Seyfarth communications simply to understand these subsequent litigation decisions and not because Plaintiff placed them "at issue" in the present malpractice claim. Accordingly, there is no at-issue waiver.

## CONCLUSION

For the reasons set forth above, Petitioners' motion for discovery is GRANTED IN PART and DENIED IN PART.  Seyfarth shall produce the documents or portions thereof that are not privileged, consistent with this opinion, within seven days of this order.

**The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 74.**

Dated: February 22, 2023
New York, New York

So ordered,

*Katharine H. Parker*
_____
KATHARINE H. PARKER
United States Magistrate Judge